STEVEN G. KALAR
Federal Public Defender
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant Garibay

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Plaintiff,

vs.

SERGIO GARIBAY, Defendant.

No. CR 12-00177-CW

**SERGIO GARIBAY'S SENTENCING MEMORANDUM**

Date: November 19, 2012
Time: 2:00 p.m.

## I. INTRODUCTION

Sergio Garibay will come before this Court on November 19, 2012, for sentencing on two counts of Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. § 841(a)(1) and one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). The Guidelines (OL 31/CH IV) call for a low-end sentence of 151 months prison, which the government[1] and Probation Office support. Such a sentence would violate 18 U.S.C. § 3553(a). A six-year prison sentence would effectuate the goals of sentencing for this nonviolent, low-level drug seller/addict who has never even spent a continuous year in jail or experienced

[1]The government does allude to "viewing 120 months as a benchmark for a low sentence or sentencing floor in this case." (United States Sentencing Memorandum at 5).

inpatient drug treatment.

The reasons underlying the proposed 151-month sentence are tautological, if not random: the government chose the Guideline sentence by determining how much substance to purchase, whether and when to schedule the firearm transaction, and whether to test the purity of the substance or not; that resulting Guideline sentence was itself arbitrarily created by the Sentencing Commission when it chose to anchor the methamphetamine Guidelines to new mandatory minimum sentences passed in 1998; those sentences had been passed without study and solely on the basis matching the sentences for crack cocaine, which are no longer law and which, to be generous, were not based on "best evidence" as to relative drug harms or the effectiveness of mandatory minimums or other strategies at reducing crime or drug use.

The applicable Guideline, when scrutinized, is simply not related to § 3553(a)'s dictates, or hence, this proceeding. The government has stressed how out-of-control Mr. Garibay is, and how often he has encountered law enforcement. Like the Sentencing Commission, however, the government has put forth zero evidence that a 151-month prison sentence will advance any of the goals of sentencing in the case of an addict who brings a friend to sell an agent a .22 rifle and who cannot even fill an order for four ounces of methamphetamine. That friend, Johnny Martin, who was clearly a co-conspirator, was given five years probation in state court for his role in this offense.

## II. STATEMENT OF FACTS

### A. The Nature of the Offense

This case involves, first, a two-ounce methamphetamine transaction with an undercover agent. Not content to arrest Mr. Garibay and begin effectuating the goals of sentencing, perhaps because a 56-gram purchase was too close to the 50-gram statutory and Guideline thresholds to leave to chance and laboratory analysis, the agents arranged for another transaction in which three ounces of methamphetamine and an unloaded .22 caliber rifle were sold to the undercover agent. PSR ¶ 9-10. This second transaction would implicate a host of additional enhancements

that could be brought to bear on Mr. Garibay. The agent requested that Mr. Garibay sell the methamphetamine and firearm together, of course to facilitate the use of enhancements based on connecting the firearm and drugs. PSR ¶ 8; *see* USSG § 2D1.1 (b)(1). These actions took advantage of Mr. Garibay's addiction, presuming that the agents knew from Mr. Garibay's "rap sheet" that Mr. Garibay was a methamphetamine addict in great need drugs and the means to get them. Mr. Garibay arranged to sell four ounces, but he could only produce three. (United States Sentencing Memorandum at 3). At this point, the government stopped accumulating sentencing enhancements on Mr. Garibay.

The vehicle in which Mr. Garibay and Mr. Martin traveled to the second transaction, and in which Mr. Garibay was found upon arrest, was traceable to Johnny Martin. PSR ¶ 11. Mr. Martin was clearly an accomplice to the methamphetamine sale, if not the supplier himself. He was also the supplier of the firearm, which is obvious from his having carried it into the house and explained its features to the agent. PSR ¶ 10. Mr. Martin was sentenced to five years probation, including eight months jail, in Alameda County Superior Court, for his role in bringing the firearm to the transaction in this case. (Complaint, Clerk's Docket and Minutes, Terms and Conditions of Probation, *People v. Johnny Joseph Martin*, No. 577189, attached as Exhibit A). The priors alleged in the complaint included attempted home invasion robbery, receiving stolen property, and three counts of vehicle theft. *Id.*

**B. Mr. Garibay's History and Characteristics**

Mr. Garibay has an eighth grade education. He dropped out of school at 16 and took a job at Ross Department Store when he became a father. PSR ¶ 82. Mr. Garibay is a good and redeemable person whose recent years have been destroyed by methamphetamine. He comes from a close-knit family that fell apart when his mother died of breast cancer. PSR ¶ 78. He has held very good jobs, including sales manager at a marine metal fabrication company, as well as forklift operator. PSR ¶ 96-98. He has taken care of his brothers in recent years, when his father has been unable to function. Lisa Pace, who rented a room to Mr. Garibay, states: "Sergio's

younger brothers often visited Sergio while he lived with me. Sergio took good care of his brothers. Sergio was like their mom. He also sent money to their father who lived in Tracy as often as he could to help take care of his other brothers and sisters. Sergio cared about his family a lot." (Declaration of Lisa Pace, attached as Exhibit B, ¶ 3) (hereinafter Pace Decl.).

Mr. Garibay was also an in-home care provider for a woman named Chyna Justine Tadder, who suffers from bone cancer and fibromyalgia. She has known Mr. Garibay for years. She recounted that Mr. Garibay helped her even when he was not paid to do so. She commented that: "before she was sick, she never would have guessed that Mr. Garibay would be the person that she would come to rely upon the most. But once she was ill, he was her biggest support." (Declaration of Madeline Larsen, attached as Exhibit C, ¶ 4). Mr. Garibay assisted Ms. Tadder for about one year. She recalled that "over the time she knew Mr. Garibay, she felt he was really growing up. He wanted to have a good job and stay out of trouble. He was always reliable and on time when he worked for her." *Id.* at ¶7.

Mr. Garibay's lack of violence also speaks to his character and personality. He has never been charged with of a crime of violence. There is no evidence that he has even been in a physical altercation with anyone. The only accusation at all relating to violence against others is that he pointed a weapon at Lisa Pace in a dispute about his possessions which she had in her home. PSR ¶ 62. The Probation Officer interviewed Mr. Garibay in detail about this incident. He explained that it was Ms. Pace who had a pellet gun held at her side during this encounter. Federal Public Defender Investigator Madeline Larsen interviewed Ms. Pace, who stated in a sworn declaration that she did not see Mr. Garibay with a gun that night. (Pace Decl, ¶5 ).

Mr. Garibay has a long-term and obvious addiction to methamphetamine. PSR ¶¶ 89-90. His criminal history is that of a low-level methamphetamine addict who burglarizes cars and engages in drug transactions to feed his habit. His longest sentence was 16-months prison. PSR ¶ 38. It appears that his longest period of actual custody time was less than one year. *Id.* The instant conduct does not differ much from the repeated low-level conduct that Mr. Garibay has

been involved with since addiction took over his life. How this incident deserves nearly ten times his longest previous sentence is a question that the government, the Probation Office, and the United States Sentencing Commission have failed to answer.

## III. ARGUMENT

### A. The Drug Guideline Abandoned Institutional Expertise in Favor of Two Flawed Sentencing Approaches: Drug Weight and Mandatory Minimum Sentences.

The problem in this case is expertly summarized by the Hon. Lynn Adelman, United States District Judge:

> [E]ven if drug weight is a satisfactory proxy for culpability, and even if it can be determined in a fair and reliable manner, the deeper problem is that the specific sentences called for by this Guideline are based on virtually nothing–not on past practice, not on Commission expertise about the harm caused by drugs, and not on research. The Guideline is thus entitled to little respect.[2]

This court can follow Judge Adelman's prescription. Whether a judge may draw any useful advice from a Guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 128 S. Ct. at 575. As described in *Rita*, the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 127 S. Ct. at 2464-65. Where a Guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 128 S. Ct. at 575.

---

[2] Judge Lynn Adelman and Jon Dietrich, *Improving the Guidelines Through Critical Evaluation: An Important New Role For District Courts*, 57 Drake L. Rev. 575 at 583-4 (2009) (footnotes omitted).

There is no dispute that the Sentencing Commission did not use empirical evidence when establishing the Guidelines for drug offenses. Instead, the Commission created a Guideline structure that mirrored the statutory mandatory minimums. *See Gall*, 128 S. Ct. at 594 & n.2 ("Notably, not all of the Guidelines are tied to this empirical evidence. For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes."). The Commission also directly tied drug sentences to the quantity of drugs possessed. *Kimbrough,* 128 S. Ct. at 567 ("The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven scheme.). The Commission itself admits that "[d]rug quantity has been called a particularly poor proxy for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-making."[3]

Like the weight scheme, anchoring the Guidelines to the mandatory minimum sentences instead of conducting analysis was also a poor choice that is noncompliant with 18 U.S.C. § 3553(a). According to one study, in which two mathematical models of cocaine markets assessed the effectiveness of mandatory minimum sentences at reducing drug abuse and drug-related crime:

> Mandatory minimums reduce cocaine consumption less per million taxpayer dollars spent than spending the same amount on enforcement under the previous sentencing regime. And either enforcement approach reduces drug consumption less, per million dollars spent, than putting heavy users through treatment programs. Mandatory minimums are also less cost-effective than either alternative at reducing cocaine-related crime. A

---

[3] USSC, *Fifteen Years of Guidelines Sentencing*: *An assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 50 (2004) [hereineafter "Fifteen Year Report"] available at http://www.ussc.gov/15_year/15_year_study_full.pdf (Last visited October 16, 2009); *see also* Judicial Conference of the United States, *1995 Annual Report of the JCUS to the U.S. Sentencing Commission* 2 (1992) ("[T]he Judicial Conference . . . encourages the Commission to study the wisdom of drug sentencing Guidelines which are driven virtually exclusively by the quantity or weight of the drugs involved.").

principal reason for these findings is the high cost of incarceration.

RAND Corporation Research Brief RB-6003, Are Mandatory Minimum Drug Sentences Cost Effective?[4] (Summarizing *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* by Jonathan P. Caulkins, C. Peter Rydell, William L. Schwabe, and James Chiesa, MR-827-DPRC, 1997, 217 pp., ISBN: 0-8330-2453-1).

Similar scholarly research summarized by Celinda Franco, in *CRS Report for Congress: Methamphetamine: Background, Prevalence, and Federal Drug Control Policies*, June 24, 2007 (Congressional Research Service), found that, though prices rose between 1981 and 2003, methamphetamine prices and purity were very volatile, and that the significant spikes in prices and purity of methamphetamine were related to regulation of precursor chemicals. *Id.* at CRS-35. Researchers also found that these effects were temporary. *Id.* at CRS-34. Note that this period included the effective date of the *Methamphetamine Trafficking Penalty Enhancement Act of 1998* and the USSC's adoption of it's strategy, discussed below.

The drug offense Guidelines are fundamentally flawed because they are not based on empirical evidence, they rely on a weight-driven scheme to the exclusion of other important sentencing factors, they reflect political will rather than independent analysis, and they adopt an ineffective means of effectuating the goals of sentencing. Courts can and should categorically reject them.

### B. The Sentencing Guidelines for Methamphetamine Arbitrarily Create a Disparity Between Methamphetamine and Other Narcotics and Yield Greater Sentences than are Necessary to Serve the Objectives of 18 U.S.C. § 3553(a).

A review of the history of the general Sentencing Guidelines at issue in this case shows that the Commission specifically failed to carry out its institutional role in promulgating methamphetamine Guidelines. Instead, in 1998, the Commission created methamphetamine

[4]available at http://www.rand.org/pubs/research_briefs/RB6003/index1.html

Guidelines identical to those which existed for crack cocaine at that time. The Commission did not enact these Guidelines in response to any research or data regarding the effectiveness of different sentences in combating methamphetamine; rather, the 1998 amendment was passed in order to "respond[] to statutory changes to the quantity of methamphetamine substance triggering mandatory minimum penalties, as prescribed in the Methamphetamine Trafficking Penalty Enhancement Act of 1998." *See* U.S.S.G. App. C (amend. 594).

That statute was passed by Congress for the stated purpose of making penalties for methamphetamine identical to those for crack cocaine. *See* H.R. Rep. No. 105-711(I) at 2, 6. As dissenters noted, this action was taken without any empirical study or input from the Sentencing Commission:

> At the outset, we strongly believe that this legislation ignores the role of the United States Sentencing Commission ("Commission") in setting federal sentencing policy. The Commission was created by Congress for the purpose of promulgating sentencing Guidelines based on the bipartisan experiences of judges, prosecutors and other criminal justice practitioners. The Commission was designed to insulate these important questions from political influences and to improve the federal sentencing system in a way that would make sentencing less arbitrary and more consistent. The Commission has not suggested this legislation.

*Id*. at 7-8 (dissenting views.) A proposed amendment which would have directed the Sentencing Commission to conduct a study of penalties for methamphetamine trafficking was defeated. *Id*. at 3.

The Sentencing Commission, in turn, amended the Sentencing Guidelines applicable to methamphetamine based solely on the increased penalties provided for in the 1998 Act. *See* U.S.S.G. App. C (amend. 594). In a report that makes no reference to effectuating the goals of sentencing, the Commission even admitted that "un-linking the Drug Quantity Table from the mandatory minimum quantities established by Congress in a manner that reduces sentences would vary from past practice of the Commission and may prove politically unwise," alluding in a footnote to the concern that an "inadequate" response by the Commission had been used by

some members of Congress to justify the new mandatory minimum sentences. (United States Sentencing Commission, *Methamphetamine, Final Report, November 1999*, at 18 & n.7, available at http://www.ussc.gov/ Research/Working_Group_Reports/Drugs/index.cfm). Not surprisingly, the Commission followed Congress's lead and instituted methamphetamine Guidelines identical to those which then existed for crack cocaine. The Guideline in this case is not based on the purposes of sentencing, and it may exist in part because of something so irrelevant to this case as the fear that a more reasoned approach would have provoked the enactment of more severe statutory measures.

Recently, the Fair Sentencing Act of 2010 was enacted to "restore fairness to Federal cocaine sentencing." *See* Pub. L. No. 111-220 (Preamble). The Act increases the quantity thresholds that trigger the statutory mandatory minimum penalties for offenses involving cocaine base ("crack") under 21 U.S.C. §§ 841(b) and 960(b). These new quantity thresholds had the effect of reducing the statutory "crack-to-powder" ratio from 100-to-1 to approximately 18-to-1.

The methamphetamine Guidelines are not subject to the Fair Sentencing Act. However, those Guidelines were increased precisely to keep them in line with the crack Guidelines that have now been roundly repudiated. Thus, methamphetamine is punished at a ratio of 100 to 1 in comparison to powder cocaine, while crack cocaine is now punished at a ratio of 18 to 1 in comparison to powder cocaine.

There is no empirical evidence, however, that methamphetamine is actually 100 times more destructive than powder cocaine. Like the crack cocaine sentencing debate, the new legislation, now 14 years old, was based on the fear of an epidemic. There is reason to believe that the aggressive national response to methamphetamine had more to do with geographic shifts to the Midwest than with any true epidemic status. "Most experts agree that, to a large extent, the recent congressional action on methamphetamine legislation was spearheaded by Members from the Midwestern states," writes Celinda Franco, in *CRS Report for Congress: Methamphetamine: Background, Prevalence, and Federal Drug Control Policies*, June 24, 2007

(Congressional Research Service)[5] before noting that "the spread of the methamphetamine problem across a number of states in the Midwest and South, although not numerically significant in a national scale, was enough to trigger a national response." *Id.* at CRS-14-15, 19. In light of the reevaluation of the crack to powder cocaine ratio, there is ample reason to reassess the validity of the methamphetamine Guidelines.

Without a doubt, the Sentencing Guidelines do not rely on the "best evidence" in the relative ranking of substances within § 2D1.1. Such review is certainly possible. Likely, when the research is done, United States policymakers will learn that there is almost no correlation between drug classifications and actual harms. In the UK, an Independent Scientific Committee on Drugs was convened to rank substances based on a multi-criteria decision analysis approach evaluating 16 criteria for 20 different substances. The results were published in *Lancet*. In order, alcohol, heroin, crack, methamphetamine, and cocaine were the top five most harmful substances to users and society. David J Nutt, F.Med.Sci.; Leslie A King. Ph.D.; Lawrence D Phillips, Ph.D.; on behalf of the Independent Scientific Committee on Drugs, *Drug Harms in the UK: a Multicriteria Decision Analysis*, Lancet 2010, 376: 1558-65, at 1561. There was almost no statistical relation between the ranking found by rigorous analysis and the ranking found in legislative classifications. In other words, drug classification in the UK is effectively random. The Commission must undertake this type of analysis. Until they do, however, sentencing judges can have no faith whatever in the rankings of substances or the lengths of sentences recommended.

The methamphetamine-to-cocaine ratio is ripe for challenge, as Professor Kyle Graham, a former prosecutor, points out in his essay *Sorry Seems to be the Hardest Word: The Fair Sentencing Act of 2010, Crack and Methamphetamine*:

> Were courts to undertake this review, they might well conclude that the 100:1 ratio is excessive, either categorically or as to a specific defendant. Powder cocaine and

---

[5] Available at http://www.policyarchive.org/handle/10207/3122.

> methamphetamine, both stimulants, involve roughly similar dosages; indeed, the average dose of methamphetamine is heavier than the average dose of powder cocaine, which if anything points toward a lower powder cocaine-to-methamphetamine quantity ratio. Furthermore, while methamphetamine use is obviously inadvisable and destructive, evolving research suggests that use of the drug does not invariably lead to significant, immediate health problems, or an inability to function as a productive member of society. Also, many years after the first cries of a methamphetamine "epidemic," it is still the case that far fewer people report use of methamphetamine than admit abuse of powder cocaine. In other words, if we are in the midst of a methamphetamine epidemic, it is a remarkably slow-spreading plague. Undeniable differences do exist between the two drugs and their respective effects. These differences are significant, but then, powder and crack cocaine also differ in respects that bear upon the assignment of properly calibrated punishment. Furthermore, while methamphetamine prosecutions do not, as a whole, present the same disparate-impact concerns associated with the powder-crack disparity, a reasonable policy disagreement with the Guidelines can be premised on a variety of considerations, not merely matters sounding in race.

Kyle Graham, *Sorry Seems to be the Hardest Word: The Fair Sentencing Act of 2010, Crack and Methamphetamine*, 45 Univ of Richmond L.R. 765, 797-99 (2011) (footnotes omitted). Treating methamphetamine as ten times worse than cocaine would yield a low-end sentence in this case of 84 months prison, based on a six-level drop in the Base Offense Level. USSG § 2D1.1(c)(7) (providing base Offense Level 26 for between 500 grams and 2.5 kilograms of cocaine, which would encompass 50 to 250 grams of methamphetamine if a 10-to-1 ratio were used). The methamphetamine-to-cocaine to ratio now extant is unfair and irrational. In order to comport with § 3553(a), this ratio must be adjusted.

**C. Because The Government Influenced the Weight Guidelines in this Case by Determining the Number and Size of Transactions, Those Guidelines Should Be Heavily Discounted.**

The government engaged in multiple transactions with Mr. Garibay, an addict, solely for the purpose of raising the Guidelines in the case. They obviously did not purchase the gun from Mr. Garibay to learn whom the supplier of the gun was. Mr. Martin supplied the gun and the government apparently has no interest in him. Similar conduct has been found to violate due process in at least one Circuit. *See United States v. Harris*, 997 F.2d 812 (10th Cir. 1993) (holding that reliance on known addiction to conduct multiple transactions for sole purpose of

increasing sentence violated due process). The government should not be permitted to set the Guidelines in this case by exploiting Mr. Garibay's addiction and choosing the number, type, and timing of transactions. This is another compelling reason to assess this case without using weight as a significant determinant of culpability. The much more important factors are Mr. Garibay's hierarchical status, his addiction, his longest past sentence, the relationship between his addiction and his prior convictions, his character, and his lack of violence. The manipulated weight of substances in this case pales in comparison to these factors when assessing the goals of sentencing.

**D. The Gun Enhancement Should Not Be Applied Because the Weapon Was an Unloaded Commodity Only and the Timing of the Gun and Drug Transactions Together Was Arranged by the Government.**

The court should grant a variance to nullify the effect of the enhancement under section 2D1.1(b)(1) in this case. That adjustment, set forth at PSR ¶ 24 provides for a two-point increase when a firearm is possessed as part of a drug trafficking offense. In this case, the firearm was unloaded and in a bag. It clearly had no role in facilitating the drug transaction. It was brought by Mr. Martin at Mr. Garibay's behest, because the government agent asked for it. There was no mention that it should be brought for protection or use during the commission of the drug transaction or any other crime. This case is very different from a case in which the defendant has a gun for protection or brings it at the behest of the government agent who suggests it would be needed for protection. While it is not clear error to apply the Guideline to cases in which a firearm is part of a transaction, that was clearly not the spirit of the Guideline, nor does that conduct reflect the majority of such cases. It would be unfair and violate § 3553(a) to impose the effect of these points on Mr. Garibay when presumably the overwhelming majority of people who have received this 2-point adjustment possessed dangerous weapons to protect or embolden themselves or intimidate others during drug trafficking. *See, e.g., U.S. v. Restrepo*, 884 F.2d 1294 (9th Cir. 1989) (loaded handgun found in room with drug distribution equipment).

A further reason to reject this adjustment is that it is solely the product of the agents' discretion in arranging the transactions. Had the drug and gun transactions merely been arranged by the government on separate dates, this adjustment would not apply. The low end Guideline range without this adjustment would be 121 months, based on an adjusted offense level 29 and a criminal history category IV. The idea that such a scheduling matter by undercover officers would amount to a 30-month difference in the sentence advances none of the sentencing factors in § 3553. On the contrary, such arbitrary action would specifically contravene the "respect for the law" factor.

**E. Because the Government Controls Whether to Test Drug Purity, and this Causes Real Disparities, the Weight-based Guidelines Should Be Further Discounted.**

Perhaps the most influential fact in this case is the purity. Mr. Garibay's Guidelines are based on 50-150 grams of "Actual Methamphetamine," with a Base Offense Level 32, as opposed to 50-200 grams of "Methamphetamine," which carries a Base Offence Level 26. *Compare* USSG § 2D1.1(c)(4) *with* USSG § 2D1.1(c)(7). The only thing that separates the two in this or almost any other methamphetamine case is the presence of a laboratory report. The concern created is one of disparate treatment within methamphetamine cases, which, along with PCP, are the only group in which purity is a factor. This concern is not based on a hypothetical risk. The United States Sentencing Commission noted that there was a disproportionately large number of sentences under the less severe Guidelines, given that laboratory reports would almost always result in a higher sentence:

> A review of a small, representative sample of 155 methamphetamine cases indicated that, as anticipated, when a purity analysis is reported, the offender is sentenced under the more severe meth-actual Guideline. When no purity analysis is reported in the presentence report, the meth-mix Guideline is used at sentencing. It is notable, however, that only 36.8 percent of methamphetamine cases (excluding Ice) are sentenced under the meth-actual calculation. Given the higher penalty structure for meth-actual, however, the expectation is that a purity analysis would be used in the majority of cases. The finding that it is not done, or at least the weight of the meth-actual does not determine the sentence, is contrary to this expectation.

(United States Sentencing Commission, *Methamphetamine, Final Report, November 1999*, at 15, available at http://www.ussc.gov/Research/Working_Group_Reports/ Drugs/index.cfm). In other words, in 1999, less than half of methamphetamine cases were sentenced under the "methamphetamine actual" Guidelines, when, statistically, nearly all should have been. It appears that the presence of a lab report, not purity itself, decided this hugely influential sentencing swing. Thus, the presence of the lab report, like the amount purchased, and the timing of the firearm transaction to coincide with a drug transaction, is another means by which the government arbitrarily constructs the Guidelines in a case. Current statistics showing the number of defendants sentence for mixture versus actual methamphetamine could not be found in the USSC's statistical yearbooks. If the ratio is anywhere near what it was in 1999, then methamphetamine defendants are facing a serious disparate sentencing problem, with more than half, unlike Mr. Garibay, receiving a huge reduction simply because the United States has not had the drugs tested, or they did not provide the lab results to the Probation Office. The Guideline range without the lab reports in this case would have had a low-end sentence of 84 months. U.S.S.G. § 2D1.1(c)(7).

### F. The Government Cannot Argue That Either Intensive Drug Treatment or Medium Length Prison Sentences Will Fail To Effectuate The Sentencing Goals, Because Neither Approach Has Been Attempted.

Neither Probation nor the Prosecution can argue that a moderate multi-year prison sentence combined with intensive inpatient drug treatment would fail to correct Mr. Garibay's addiction and behavior. That's because neither approach has ever been tried with him. In his case, because all of his crimes are related to addiction, there are significant opportunities to protect the public by the use of "treatment as incapacitation," as described in the Seventh Circuit's very thorough opinion on mental health and sentencing in *U.S. v. Miranda*, 505 F.3d 785 (7th Cir. 2007). In that case, the sentence of a bank robber diagnosed with schizoaffective disorder was reversed based on the district court's failure to give adequate consideration to

arguments that the defendant's mental illness reduced the need for deterrence, made incapacitation by imprisonment less appropriate, and rendered him less deserving of punishment. *Id.* at 792-93.

As to the incapacitation sentencing rationale, the *Miranda* court observed:

> If the mental illness is treatable, as is the case with Miranda, the goal of incapacitation may not be advanced by a heavy sentence . . . . Instead, mental health treatment would "incapacitate" Miranda from committing further crimes. In this case, there is evidence that Miranda was being treated for mental illness at the time he committed his crimes, and so the court may determine that the only way to truly incapacitate Miranda is a heavy prison sentence. On the other hand, there is also some evidence that Miranda was not correctly diagnosed or appropriately treated until his imprisonment for this crime. The district court may decide, if it credits Dr. Yohanna's testimony that Miranda has improved under his current treatment regime, that Miranda is not a further threat, and that the goal of incapacitation is not served well by lengthy imprisonment.

*Id.* at 793 (citation omitted).

*Miranda* applies equally well to Mr. Garibay's issues. He is a severe untreated addict. Methamphetamine addiction is treatable. According to the Congressional Research Service Report, "Although research indicates that methamphetamine addiction may require longer treatment periods and methods, its treatment can be just as successful as that of other drugs." Celinda Franco, in *Methamphetamine: Background, Prevalence, and Federal Drug Control Policies*, June 24, 2007 (Congressional Research Service) at CRS-26. One cannot argue that drug treatment, which the Probation Office itself endorses as effective, has failed or will fail in this case. Given that there is not a lengthy prison history, one cannot argue that a six-year prison term will fail to impress upon Mr. Garibay or the public the seriousness of his conduct, either. Such a sentence would be more than four times his longest previous term. This recommended term is based on the "best evidence" and "best practices." It is a pragmatic sentence designed to actually serve the interests of deterrence, incapacitation, rehabilitation, and just desserts, without a tremendous waste of community resources and years of Mr. Garibay's life.

**III. Conclusion**

The weight- and mandatory-minimum-based Guidelines in this case do a disservice to the court's task of fashioning a sentence that effectuates the goals of sentencing. The defense respectfully requests that the court sentence Mr. Garibay to 72 months prison, followed by five years of Supervised Release. It is further requested that the court recommend RDAP and designation to a facility near the Bay Area.

Dated: November 14, 2012

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

/s/

JOHN PAUL REICHMUTH
Assistant Federal Public Defender